Jared G. Parker
PARKER SCHWARTZ, PLLC
7310 North 16th Street, Suite 330
Phoenix, AZ 85020

Lisa G. Beckerman
Joanna Newdeck
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036

*Counsel for Pinpoint Holdings, Inc.*

Alisa C. Lacey
Christopher C. Simpson
STINSON LEONARD STREET LLP
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85004

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT ARIZONA**

| | |
|---|---|
| In re<br><br>ACCIPITER COMMUNICATIONS, INC., d/b/a ZONA COMMUNICATIONS,<br><br>Debtor. | Chapter 11<br><br>Case No. 2:14-bk-04372-GBN<br><br>**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY PINPOINT HOLDINGS, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** |

## TABLE OF CONTENTS


**Page**

**1. INTRODUCTION AND SUMMARY ..... 1**
- **1(a) Overview ..... 1**
- **1(b) Notice to Holders of Claims and Equity Interests ..... 2**
- **1(c) Summary Of Treatment Of Claims And Equity Interests Under The Plan ..... 3**
- **1(d) Voting Procedures, Ballots, and Voting Deadline ..... 4**
- **1(e) Confirmation Procedures ..... 5**

**2. BACKGROUND REGARDING THE DEBTOR ..... 6**
- **2(a) Overview and History ..... 6**
- **2(b) Events Precipitating the Chapter 11 Filing ..... 7**
- **2(c) Prepetition Capital Structure ..... 9**

**3. SIGNIFICANT EVENTS IN CHAPTER 11 CASE ..... 11**
- **3(a) Automatic Stay; Administrative Status ..... 11**
- **3(b) FCC Rule Changes ..... 11**
- **3(c) Sale Efforts ..... 13**
- **3(d) Filing and Withdrawal of the Debtor Plan ..... 14**
- **3(e) Significant Events Leading up to the Filing of the Plan ..... 14**

**4. DESCRIPTION OF THE PLAN ..... 15**
- **4(a) Introduction ..... 15**
- **4(b) Summary of Claims Process, Bar Date, and Professional Fees ..... 15**
- **4(c) Classification of Claims and Equity Interests ..... 16**
- **4(d) Treatment of Unclassified Claims ..... 16**
  - **4(d)(1) Allowed Administrative Claims ..... 16**
  - **4(d)(2) Priority Tax Claims ..... 16**
  - **4(d)(3) Professional Fees ..... 16**
  - **4(d)(4) Treatment. ..... 17**
- **4(e) Treatment of Classified Claims and Interests ..... 18**
  - **4(e)(1) Class 1 (Priority Claims) ..... 18**
  - **4(e)(2) Class 2 (Miscellaneous Secured Claims) ..... 18**
  - **4(e)(3) Class 3 (RUS Loan Claims) ..... 19**
  - **4(e)(4) Class 4 (General Unsecured Claims) ..... 19**
  - **4(e)(5) Class 5 (Equity Interests and Equity Related Claims) ..... 19**

**5. PLAN IMPLEMENTATION ..... 20**
- **5(a) Effective Date Funding ..... 20**

5(b) Restructuring Transactions ... 20
5(c) Formation of the Unsecured Creditor Trust ... 20
5(d) Dismissal of Adversary Proceeding. ... 20
5(e) Claims Administration ... 20
5(f) Restated Governance Documents ... 21
5(g) Section 1145 Exemption ... 21
5(h) Post-Confirmation Management ... 22

6. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 24
6(a) Assumption and Rejection of Contracts and Leases ... 24
6(b) Cure of Defaults ... 24
6(c) Rejection Claims Bar Date ... 24
6(d) Indemnification Obligations ... 25
6(e) Benefit Plans ... 25

7. DESCRIPTION OF OTHER PROVISIONS OF THE PLAN ... 25
7(a) Vesting of Assets ... 25
7(b) Discharge ... 25
7(c) Injunction ... 26
7(d) Exculpation ... 26
7(e) Avoidance Actions and Litigation Claims ... 26
7(f) Retention of Jurisdiction After the Effective Date ... 27

8. ACCEPTANCE AND CONFIRMATION OF THE PLAN ... 28
8(a) Acceptance of the Plan ... 28
8(b) Feasibility of the Plan ... 28
8(c) Best Interests Test ... 29
8(c)(1) Explanation ... 29
8(c)(2) Application of the Liquidation Analysis ... 30

9. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ... 31
9(a) Introduction ... 31
9(b) Federal Income Tax Consequences to Reorganized Accipiter ... 32
9(c) Federal Income Tax Consequences to Holders of Claims and Equity Interests ... 32
9(c)(1) In General ... 32
9(c)(2) Accrued Interest ... 33
9(c)(3) Market Discount ... 33
9(d) Information Reporting and Backup Withholding ... 34

9(e) Importance of Obtaining Professional Tax Assistance ........ 34

10. RISK FACTORS ........ 34

10(a) Generally ........ 34

10(b) Risk of Non-Confirmation of the Plan ........ 36

11. ALTERNATIVES TO THE PLAN ........ 36

11(a) Continuation of the Chapter 11 Case ........ 37

11(b) Alternative Plans of Reorganization ........ 37

11(c) Liquidation Under Chapter 7 ........ 37

12. CONCLUSION ........ 37

12(a) Hearing on and Objections to Confirmation ........ 37

12(a)(1) Confirmation Hearing ........ 37

12(a)(2) Deadline for Objections to Confirmation ........ 37

12(b) Recommendation ........ 38

APPENDIX 1: Plan

APPENDIX 2: Order Approving Disclosure Statement

APPENDIX 3: Select Financial Information

APPENDIX 3.1: Debtor's Operating Projections through December 16, 2016

APPENDIX 3.2: Effective Date Balance Sheet; Operating Projections Post-Effective Date

APPENDIX 4: Liquidation Analysis

APPENDIX 5: Claims Schedule

# 1. INTRODUCTION AND SUMMARY

## 1(a) Overview

Accipiter Communications, Inc., doing business as Zona Communications (the "*Debtor*"), filed its voluntary Chapter 11 bankruptcy petition under Title 11 of the United States Code (the "*Bankruptcy Code")* in the United States Bankruptcy Court for the District of Arizona (the "*Bankruptcy Court")* on March 28, 2014 (the "*Petition Date").*

Pinpoint Holdings, Inc., the proposed purchaser in this case ("*Pinpoint*" or the "*Purchaser*"), and the Official Committee of Unsecured Creditors provide this disclosure statement (the "*Disclosure Statement*") and the exhibits hereto, the accompanying ballots, and the related materials delivered herewith pursuant to section 1126(b) of the Bankruptcy Code, in connection with this solicitation of votes for the *First Amended Chapter 11 Plan of Reorganized Proposed by Pinpoint Holdings, Inc. and the Official Committee of Unsecured Creditors*, dated as of September 29, 2016 (as amended or modified from time to time, the "*Plan*"), a copy of which is annexed to this Disclosure Statement as **Appendix 1**. The Bankruptcy Court has approved this Disclosure Statement (under Bankruptcy Code §1125 in connection with confirmation of the Plan in this case (the "*Chapter 11 Case").*

As further detailed below, prior to the filing of the Plan, the Debtor and the Committee had filed the Third Amended Plan of Reorganization (the "*Debtor Plan*"). A hearing seeking approval of the related disclosure statement (the "*Debtor Disclosure Statement*") for the Debtor Plan was originally scheduled for August 11, 2016 and subsequently was adjourned to September 15, 2017 [D.I. 280]. Prior to that hearing, on September 12, 2016 [D.I. 295], the Committee withdrew its support of the Debtor Plan and the Debtor, on September 13, 2016 [D.I. 296], withdrew the Debtor Plan without prejudice.

The following introduction and summary is a general overview only and is qualified by, and should be read in conjunction with, the more detailed discussions, information, and financial statements appearing elsewhere in this Disclosure Statement and the Plan. All capitalized terms not defined in this Disclosure Statement have the meanings given to them in the Plan.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the circumstances giving rise to this Chapter 11 Case, and the proposed reorganization of the Debtor's debt obligations under the Plan. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and how voting on the Plan will occur. **CERTAIN FACTUAL AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WAS ORIGINALLY CONTAINED IN THE DEBTOR DISCLOSURE STATEMENT. THE PLAN PROPONENTS HAVE NOT UNDERTAKEN AN INDEPENDENT INVESTIGATION TO VERIFY THAT SUCH INFORMATION IS ACCURATE AND CORRECT.** Certain provisions of the Plan, and the descriptions and summaries contained in this Disclosure Statement, may be the subject of continuing negotiations among the Debtor and various parties, may not have been finally agreed on, and may be modified. Those modifications, however, will not materially affect the distributions contemplated by the Plan.

Pinpoint and the Committee (together, the "*Plan Proponents*") are the proponents of the Plan within the meaning of Bankruptcy Code §1129. The Plan contains separate Classes and

proposes recoveries for holders of Claims against and Equity Interests in the Debtor. **AFTER CAREFUL REVIEW OF THE DEBTOR'S CURRENT FINANCIAL CONDITION AND THE NEEDS ASSOCIATED WITH THE CONTINUED OPERATION OF THE DEBTOR'S BUSINESS, PINPOINT AND THE COMMITTEE HAVE CONCLUDED THAT THE RECOVERY TO CREDITORS WILL BE MAXIMIZED BY THE REORGANIZATION PROPOSED IN THE PLAN.**

**1(b) Notice to Holders of Claims and Equity Interests**

This Disclosure Statement is being used to solicit votes on the Plan only from holders of impaired Claims that are receiving distributions under the Plan. It is being transmitted to Creditors with unimpaired Claims, holders of Equity Interests who are impaired but are receiving no recovery under the Plan, and other parties in interest for informational purposes. The principal purpose of this Disclosure Statement is to provide adequate information to enable holders of impaired Claims to make a reasonably informed decision with respect to the Plan before voting to accept or reject the Plan.

On November 1, 2016, the Bankruptcy Court entered an order, attached as **Appendix 2** to this Disclosure Statement, approving this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Creditors to vote on the Plan as required by Bankruptcy Code §1125. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR THE BANKRUPTCY COURT'S ENDORSEMENT OF THE PLAN.**

Holders of Claims are encouraged to read this Disclosure Statement and its appendices carefully and completely before deciding to accept or reject the Plan. If a description in this Disclosure Statement and a term of the Plan conflict, the Plan governs.

This Disclosure Statement and the other materials included in the solicitation package are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes on the Plan. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor or the Plan other than the information contained in this Disclosure Statement.

Certain of the information contained in this Disclosure Statement is inherently forward-looking and contains estimates, assumptions, and projections that may prove materially different from actual future results. Except as otherwise specifically stated, this Disclosure Statement does not reflect any events that may occur after the date of this Disclosure Statement and that may materially affect the information contained in this Disclosure Statement. The Plan Proponents do not intend to update the information contained in this Disclosure Statement.

The financial information contained in this Disclosure Statement has not been audited by a certified public accountant and may not have been prepared in accordance with generally accepted accounting principles.

This Disclosure Statement has been prepared in accordance with Bankruptcy Code §1125 and Bankruptcy Rule 3016(b) and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "*SEC*'), nor has the

SEC passed on the accuracy or adequacy of the statements contained in this Disclosure Statement.

This Disclosure Statement may not be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan on holders of Claims against, or Equity Interests in, the Debtor.

**1(c) Summary Of Treatment Of Claims And Equity Interests Under The Plan**

The Plan contains definitions and rules of interpretation and provides the treatment of separate classes for holders of Claims against, and Equity Interests in, the Debtor. Under Bankruptcy Code §1123(a)(1), Administrative Claims and Priority Tax Claims are not classified.

The table below summarizes the classification and treatment of the prepetition Claims and Equity Interests under the Plan. The classification and treatment for all Classes are described in more detail in Section 4 of this Disclosure Statement and Article 3 of the Plan.

| **Class** | **Description** | **Treatment** |
|---|---|---|
| 1 | Priority Claims<br><br>(Unimpaired; deemed to accept) | Each holder of an Allowed Priority Claim other than a Priority Tax Claim receives Cash in an amount equal to its Allowed Priority Claim on the later of: (i) the Effective Date, or as soon after that date as feasible; and (ii) 30 days after the Priority Claim is Allowed; unless, before the later of those two dates, the holder of the Claim and Reorganized Accipiter agree in writing to a different date. |
| 2 | Miscellaneous Secured Claims<br><br>(Unimpaired; deemed to accept) | Each holder of an Allowed Miscellaneous Secured Claim in Class 2 receives Cash in an amount equal to its Allowed Miscellaneous Secured Claim from the proceeds of the collateral to which the claim pertains on the later of: (i) the Effective Date, or as soon after that date as feasible; and (ii) the closing date of the sale of the collateral to which the claim pertains; unless, before the later of those two dates, the holder of the Claim and Reorganized Accipiter agree in writing to a different date. Each holder of an Allowed Miscellaneous Secured Claim retains all Liens on applicable property of the Estate arising under applicable law until that holder's Allowed Miscellaneous Secured Claim is paid in full under the Plan. |
| 3 | RUS Loan Claims<br><br>(Impaired; entitled to vote) | On or as soon as is reasonably practicable after the Effective Date but in no event later than 5 business days after the Effective Date, in full and final satisfaction of the RUS Loan Claims, the holder(s) of the RUS Loan Claims shall receive a Cash payment of $5,250,000 and all liens held on account of the RUS Loan Claims shall be released, and shall be deemed released, by RUS. For the avoidance of doubt, RUS shall execute any such release or other |

| | | |
|---|---|---|
| | | necessary documents to evidence and effectuate the release of its liens requested by the Purchaser. |
| 4 | General Unsecured Claims<br><br>(Impaired; entitled to vote) | Each holder of an Allowed General Unsecured Claim receives, in full and final satisfaction of its Allowed General Unsecured Claim, payment in full in Cash of its Allowed General Unsecured Claim as follows: (i) its *pro rata* share of $200,000, to be distributed on or as soon as reasonably practicable after the Effective Date but in no event later than 5 business days after the Effective Date so long as such creditor has provided Reorganized Accipiter with a completed W-8 or W-9 tax form and (ii) payment of the balance of its Allowed General Unsecured Claim as soon as is practicable but, in any event, no later than in eight equal monthly installments commencing on the first Business Day one month from the Effective Date, in all cases to be distributed on a *pro rata* basis (the "*Installment Payments*"). Reorganized Accipiter may prepay any Allowed General Unsecured Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without affecting the timing of payments on account of any other Allowed General Unsecured Claim. The Installment Payments shall be secured by a first lien on the Office Building in favor of the Unsecured Creditor Trustee, who shall be selected by the Committee and identified in the Plan Supplement. |
| 5 | Equity Interests and Equity Related Claims<br><br>(Impaired; deemed to reject) | Under Bankruptcy Code § 510(b), each Equity Related Claim is subordinated to all Claims or Equity Interests senior or equal to the Claim or Equity Interest represented by the Equity Related Claims. As of the Effective Date, all Equity Interests shall be cancelled and all Equity Related Claims are extinguished. The holders of Equity Interests and Equity Related Claims do not receive or retain any rights, property, or distributions on account of their Equity Interests or Equity Related Claims. |

**1(d) Voting Procedures, Ballots, and Voting Deadline**

Accompanying this Disclosure Statement are, among other things, copies of: (1) the Plan **(Appendix 1** and separately filed in this Chapter 11 Case); (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider confirmation of the Plan, and the time for filing objections to the confirmation of the Plan (the "*Confirmation Hearing Notice*"); and (3) if you are entitled to vote, a Ballot (and return envelope along with detailed instructions accompanying the Ballot) to be used in voting to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by completing the Ballot. You must provide all the information requested

on the Ballot; failure to do so may result in your vote being disqualified. For your vote to be counted, your Ballot must be properly completed and **actually received** no later than December 7, 2016, at 5:00 p.m. Arizona Time (the *"Voting Deadline")* by counsel for the Committee whose address and contact information is on the Ballot.

**Ballots should not be sent to the Debtor, Pinpoint, the Committee members, the Bankruptcy Court, the U.S. Trustee, or any other party other than the Committee's counsel. Ballots not actually received by the Voting Deadline by the Committee's counsel will not be counted.**

If you have any questions about the procedure for voting or the packet of materials that you have received or you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to either of those documents, please contact: Christopher C. Simpson, Esq., Stinson Leonard Street LLP, 1850 N. Central Avenue, Suite 2100, Phoenix, AZ 85004; 602-212-8623; Christopher.simpson@stinson.com, counsel to the Committee.

**1(e) Confirmation Procedures**

Under Bankruptcy Code § 1126(f), if a class of claims or interests is unimpaired under a plan, that class (and each member of that class) is conclusively presumed to have voted in favor of the plan and is not solicited to vote on the plan. In this Chapter 11 Case, the Plan contains four Classes of Creditors and one Class of Equity Interests. All Unclassified Claims and all Claims in Classes 1 and 2 are unimpaired by the Plan, so holders of those Claims are presumed to have voted in favor of the Plan and will not be solicited to vote on the Plan. All Claims in Classes 3 and 4 are impaired, so holders of those Claims are entitled to vote to accept or reject the Plan. Class 5 under the Plan (Equity Interests and Equity Related Claims) is also impaired but receives no recovery under the Plan and is, therefore, deemed to reject the Plan without voting.

The Bankruptcy Court has scheduled the Confirmation Hearing to begin on December 14, 2016 at 1:30 p.m. (Arizona time) before the Honorable George B. Nielsen, United States Bankruptcy Judge, at the United States Bankruptcy Court, 203 North 1st Avenue, Phoenix, Arizona 85003. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjournment date made at the Confirmation Hearing. The Bankruptcy Court has ordered that any objections to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court (via the Bankruptcy Court's ECF system) and served so that they are actually received on or before December 7, 2016, at 5:00 p.m. (Arizona time) by counsel to Pinpoint, the Committee, and the Office of the United States Trustee.

THE COMMITTEE AND PINPOINT BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS. THE COMMITTEE AND PINPOINT STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## 2. BACKGROUND REGARDING THE DEBTOR[1]

### 2(a) Overview and History

The Debtor is a Nevada corporation with its principal place of business in Phoenix, Arizona, where it employs eight full-time employees.

The Debtor was formed in 1995 to provide telecommunications services to unserved or underserved, mostly rurally-situated, residences and businesses in central Arizona who previously had little or no access to any telecommunications services. Investing in the technological and physical infrastructure required to provide telephone and internet service to far-flung rural areas with extremely low population density would normally be financially infeasible. Yet the Debtor is one of many companies throughout the United States providing telecommunications services to rural subscribers under circumstances in which customer-generated revenue alone falls far short of the level necessary to sustain operations. Because the Debtor cannot rely on the urban densities and economies of scale enjoyed by telecommunications providers like CenturyLink and Cox, the Debtor is able to provide critical telecommunications services to rural customers only by participating in two federal programs:

First, the Debtor receives revenue subsidies from the federal Universal Service Fund ("*USF*"), which is administered under the authority of the Federal Communications Commission (the *"FCC)* and which was created by Congress to ensure that the telecommunications needs of all Americans, irrespective of where they live, are met. Because providing telecommunications services to small numbers of customers living in sparsely-populated areas is economically infeasible, the USF is designed to provide subsidized revenue streams to providers like the Debtor, ensuring that the provider's steep investments in infrastructure and its operational costs can be sustained while also assuring that rural customers pay rates that are affordable and reasonably comparable to those in urban areas.

Second, because the costs of building infrastructure—digging and cabling trenches, implementing transport and switching equipment—are prohibitive when compared with the customer revenue that can be expected from rural areas, and because those costs must be incurred before customer revenues or USF subsidies are received, the Debtor avails itself of capital debt financing provided under a rural telecommunications loan program administered by the Rural Utilities Service (the *"RUS"),* an agency of the U.S. Department of Agriculture (the *"USDA").* The RUS has a Congressional mandate to make low-interest loans available to telecommunications providers such as the Debtor to fund construction of telecommunications infrastructure in low-density areas.

The Debtor is an Incumbent Local Exchange Carrier, which holds a Certificate of Convenience and Necessity ("*CC&N*") granted by the Arizona Corporation Commission in 1995 to serve portions of Maricopa and Yavapai Counties. The original service territory encompassed approximately 650 square miles and only 115 occupied residences, an area that has since been increased to encompass over 1,000 square miles. The CC&N imposes on the Debtor the obligation to provide regulated telephone services in its service area. The Debtor

---

[1] Factual and other information contained in this Article 2 was originally contained in the Debtor Disclosure Statement. The Plan Proponents have not undertaken an independent investigation to verify that the information contained in the Article 2 is accurate.

also provides deregulated services in its market, most notably broadband Internet access and DirecTV® television services.

The Debtor focused its initial years of operation on serving highly remote, mostly residential locations in mountainous and rocky terrain. Because it was attempting to deliver services in expensive-to-construct terrain to an exceedingly small customer base, the Debtor depended heavily on RUS loans and USF subsidies. As a result of the support provided by these two programs, the Debtor was able to deploy telephone service to rural residents at rates comparable to rates paid by residents in Metro Phoenix.

Currently, the Debtor's service area comprises approximately 7,200 inhabited residences. As of December 2014, the Debtor served 1,883 access lines on approximately 309 route-miles of cable, serving an average of approximately 6.09 access lines per route mile. The Debtor's fiber network currently serves customers in seven distinct population centers.

Establishing cable routes in rural portions of the Debtor's geography requires construction methods that are much more costly than those that can be employed in other areas of the country. The Debtor's operative area includes desert mountains, canyons, and rocky terrain, including the entirety of Lake Pleasant, a fifteen square-mile reservoir that draws thousands of recreational visitors per year. The wireless telecommunications coverage serving Lake Pleasant is connected to the Debtor's wireline facilities.

Additionally, as metropolitan Phoenix experienced rapid growth through 2008, the Debtor's service area began to hold potential for new suburban-density housing developments. By serving higher-density areas within its service territory, the Debtor could lower its dependence on USF subsidies while still maintaining its regulatory obligation to serve rural areas. Initially, the Debtor was blocked from serving Vistancia, the first large-scale suburban-density development to emerge in the Debtor's service area. The real estate developer and a competing telecommunications provider created a formidable, easement-based, barrier to entry, effectively monopolizing the telecommunications services in the soon-to-be-constructed housing development. The profits taken by the telecommunications monopoly were to be shared between the developer and the provider. When the Debtor discovered this agreement and its egregious terms, the Debtor filed complaints in Maricopa County Superior Court and with the Arizona Corporation Commission. The Debtor also brought the matter to the attention of the U.S. Department of Justice Antitrust Division, which commenced an investigation.

In November 2005, the developer and the provider agreed to a legal settlement that finally allowed the Debtor access to construct network infrastructure and offer services in that development. The Debtor was able to serve its first customers in that development by early 2007. Since then, the Debtor has experienced significant customer growth while maintaining a minimal increase in its discretionary operating expenses. This trend has caused the Debtor to realize a dramatic increase in efficiencies and has significantly lowered the Debtor's dependence on USF subsidies.

**2(b) Events Precipitating the Chapter 11 Filing**

In 2011, the FCC released a series of rule changes intended to reform the USF system. One change of significance to the Debtor was the implementation of a cap that limited USF support to an amount no greater than $250 per "regulated loop" per month. The Debtor quickly realized that its current support levels were above the caps and that the Debtor would experience substantial revenue reductions once the cap became effective in July 2012. The Debtor also realized that the FCC's implementation of the cap counted regulated loops as reported by the

company two years prior—the revenues received in 2012 would be limited based on 2010's loops. Owing to the Debtor's rapid growth, the 2010 number of loops created a much more severe revenue reduction than if a current loop count were used.

The FCC's use of two-year-old line counts meant that the Debtor's revenues would be severely reduced until 2015, despite the fact that the Debtor has already achieved the growth necessary to alleviate the impact of the caps. More importantly, those revenue reductions would have been dramatic enough that the Debtor would have incurred a net operating loss in 2012 and would have become cash flow insolvent by early 2013, just over six months after the FCC implemented the new rule.

Accordingly, on April 18, 2012 the Debtor sought a waiver of the $250 per line limit for a 30-month period. In January 2013, the FCC granted the Debtor a waiver for 24 months, ensuring a somewhat higher level of USF subsidies than the unsustainable levels that would have obtained had the Debtor not been granted a waiver.

Nonetheless, the Debtor has been operating in a precarious cash flow posture since approximately July 2012 due to its inability to obtain new financing from RUS or restructuring of its debt. Since 2009, the Debtor has submitted multiple applications for new financing to RUS and RUS did not approve any new loan funding. The Debtor then sought RUS approval for restructuring of its debt. RUS did not approve the Debtor's restructuring proposals.

Without a substantial restructuring of the RUS debt now outstanding, the Debtor will be unable to fulfill its legal obligation to provide telecommunications services to rural subscribers and will eventually be forced to shut its business down entirely. The Debtor has, for more than five years, attempted to find a way to comply with legal obligations placed on the Debtor by the FCC and deal with RUS's pre-bankruptcy decision not to fund the Debtor's growth, which would significantly enhance the Debtor's ability to repay the RUS debt, reduce its dependence on USF subsidies, and ultimately qualify for more conventional third-party working capital financing.

Ultimately, if the Debtor fails to meet certain growth targets necessary to reduce its need for USF subsidies, the Debtor will be forced to close its business. Not restructuring the RUS debt would create an immediate existential threat to the Debtor and to the subscribers who would lose telecommunications services—approximately 1,240 residential subscribers and approximately 506 business subscribers, including an elementary school, an enforcement agency, a fire station, two municipal water supply facilities, and a bank. Worse, approximately 500 of the Debtor's rural subscribers would be left with no other provider available for terrestrial voice and broadband services.

The Debtor filed this Chapter 11 Case following the Debtor's inability to negotiate a consensual restructuring of the RUS debt with RUS. By March 2014, the Debtor could not deplete its operating cash any further and had to act to protect not only its ability to provide federally-mandated services to vulnerable customers but also the interests of its creditors and stakeholders. By discharging the RUS debt pursuant to the terms of the Plan, Reorganized Accipiter will be able to continue its customer growth, reducing Reorganized Accipiter's dependence on USF subsidies while assuring that telecommunications services remain available to residents and businesses that have no other realistic option for those services.



Case 2:14-bk-04372-GBN Doc 341 Filed 11/01/16 Entered 11/01/16 17:50:51 Desc
Main Document Page 12 of 42

**2(c) Prepetition Capital Structure**

In 1996, the Debtor applied for various RUS loans. RUS uses a letter system to designate and identify various loan applications. As a result, the Debtor's applications in 1996 were given the designation of "A." The Debtor was initially approved for three loans at that time: (i) a RUS loan in the maximum amount of $88,000 (the *"RUS A Loan*"); (ii) a loan from the Rural Telephone Bank *("RTB")* in the maximum amount of $51,500 (the *"RTB A Loan");* and (iii) a RUS "hardship" loan in the maximum amount of $7,000,000 (the *"Hardship Loan*" and, together with the RUS A Loan and the RTB A Loan, the "A *Loans").* The interest rate for the "hardship" loan was fixed at 5%, while the RUS A Loan and the RTB A Loan were to bear interest at a "cost-of-money" rate calculated in accordance with a formula set forth in federal regulations governing RUS loan programs.

The A Loans are governed by the terms of the Telephone Loan Contract dated as of July 3, 1996 between the Debtor, RUS and the RTB (the "A *Loan Agreement"),* as well as the Mortgage Note of the same date reflecting the RUS A Loan (the *"RUS A Loan Note")* and the Mortgage Note of the same date reflecting the Hardship Loan (the *"Hardship Loan Note"* and, together with the RUS A Loan Note, the "A *Loan Notes").* The A Loan Notes and the A Loan Agreement are collectively referred to as the "A *Loan Documents."* Originally, the A Loan Notes were secured in part by the Mortgage, Security Agreement, and Financing Statement dated as of October 1, 1997. But in 2005, as part of the documentation surrounding the C Loan Notes described below, the Debtor, RUS, and the RTB entered into the Restated Mortgage, Security Agreement and Financing Statement dated as of October 13, 2005 (the *"Security Agreement"),* which replaced and restated the original mortgage in its entirety. The Security Agreement purports to grant the RUS a blanket security interest in substantially all the Debtor's real and personal property but, as described in greater detail below, RUS does not have a lien on the Debtor's cash or accounts receivable.

The Debtor never drew down any funds under the RTB A Loan, so the note related to the RTB A Loan was ultimately rescinded in full and marked as cancelled in May 2008. Through a series of draws *("Advances")* between August 1998 and February 2004, the Debtor drew down fully on the Hardship Loan and in August 2006 drew down fully on the RUS A Loan. As of the Petition Date, the Debtor believes that it owes combined principal on the RUS A Loan and the Hardship Loan in the approximate amount of $2,174,311.06. The aggregate of RUS A Loan draws bear interest at an approximate rate of 5.006%. Under the terms of the A Loan Documents, the A Loans mature on October 1, 2017. Because the Advances occur over a period of time but the maturity date is fixed, each Advance has a different amortization schedule. Further, with respect to all loans other than the Hardship Loan (that is, the A Loans described above and the B Loans and C Loans described below), each Advance bears interest at a unique, formula-derived rate.

In 2001, the Debtor applied for additional loans through RUS, which were given the designation of "B." The Debtor was approved for two loans at that time: (i) a RUS loan in the maximum amount of $5,792,000 (the "*RUS B Loan*"); and (ii) an RTB loan in the maximum amount of $3,377,850 (the "RTB *B Loan*" and, together with the RUS B Loan, the "B *Loans").* The B Loans were to bear interest at a "cost-of-money" rate calculated in accordance with a formula set forth in federal regulations governing the RUS loan programs.

The B Loans are governed by the terms of the Telephone Loan Contract Amendment dated as of August 1, 2001 between the Debtor, RUS and the RTB (the "B *Loan Agreement"),* as well as the Mortgage Note of the same date reflecting the RUS B Loan (the *"RUS B Loan*

*Note")* and the Mortgage Note of the same date reflecting the RTB B Loan (the "*RTB B Loan Note"* and, together with the RUS B Loan Note, the "B *Loan Notes").* The B Loan Notes and the B Loan Agreement are collectively referred to as the "B Loan Documents." Originally, these B Loan Notes were secured in part by the Mortgage, Security Agreement, and Financing Statement dated as of October 1, 1997, and the Supplemental Mortgage dated as of August 1, 2001, but the Security Agreement is now the only security agreement pertaining to the B Loan, as with the A Loans and the C Loans.

Through Advances between February 2004 and March 2013, the Debtor drew down approximately $5,686,278 of its maximum availability under the RUS B Note. Through one Advance in February 2013, the Debtor drew down $478,663 of its maximum availability under the RTB B Note. As of the Petition Date, the Debtor believes that it owes principal in the approximate amounts of $3,990,904.02 on the RUS B Loan and $465,803.43 on the RTB B Loan. Under the terms of the B Loan Documents, the B Loans mature on August 1, 2022. Again, because the Advances occur over a period of time but the maturity date is fixed, each Advance has a different amortization schedule. Further, with respect to each of the B Loans, each Advance bears interest at a unique, formula-derived rate. In particular, the interest rates for the Advances under the RUS B Loan vary between 1.4% and 5%, and the interest rates for the one Advance under the RTB B Loan is 5%.

In 2005, the Debtor applied for additional loans through the RUS, which were given the designation of "C." the Debtor was approved for two loans at that time: (i) a RUS loan in the maximum amount of $12,739,000 (the *"RUS C Loan*"); and (ii) an RTB loan in the maximum amount of $8,916,600 (the *"RTB C Loan"* and, together with the RUS C Loan, the "C *Loans").* The C Loans were to bear interest at a "cost-of-money" rate calculated in accordance with a formula set forth in federal regulations governing the RUS loan programs.

The C Loans are governed by the terms of the Loan Agreement dated as of October 13, 2005 between the Debtor, RUS, and the RTB (the "C *Loan Agreement"),* as well as the Promissory Note of the same date reflecting the RUS C Loan (the *"RUS C Loan Note")* and the Promissory Note of same date reflecting the RTB C Loan (the *"RTB C Loan Note"* and, together with the RUS C Loan Note, the "C *Loan Notes").* The C Loan Notes and the C Loan Agreement are collectively referred to as the "C *Loan Documents."* The Debtor's obligations under the C Loan Documents are secured under the Security Agreement.

Between the time of the approval of the B Loans and the approval of the C Loans, RUS's rules changed such that the C Loan Documents reflected a five-year automatic expiration of the ability to draw down on the line. Neither the A Loans nor the B Loans had such a restriction on the time limit for the Debtor to draw down on its availability. The Debtor sought and received a two-year extension of this automatic expiration, extending the Debtor's ability to seek Advances under the C Loan Documents through October 2012.

Through Advances between November 2006 and September 2010, the Debtor drew down fully on the RUS C Loan, and drew down approximately $4,071,786 on the RTB C Loan. As of the Petition Date, the Debtor believes that it owes principal in the approximate amounts of $10,305,276.67 on the RUS C Loan and approximately $3,818,918.99 on the RTB C Loan. Under the terms of the C Loan Documents, the C Loans mature on October 13, 2026. Again, because the Advances occur over a period of time but the maturity date is fixed, each Advance has a different amortization schedule. Further, with respect to each of the C Loans, each Advance bears interest at a unique, formula-driven rate. In particular, the interest rates for the

Advances under the RUS C Loan vary between 3.12% and 5.03%, and the interest rate for all of the Advances under the RTB C Loan is 5%.

As a result, the Debtor believes that, as of the Petition Date, it owed approximately $20,755,214 in aggregate principal to RUS on account of the A Loans, the B Loans, and the C Loans (collectively, the *"Loans").*

The Debtor is a privately-held company, with its stock held by six individuals: Lewis van Amerongen (52.76%), Little S Trust (20.31%), Charles Phillip Fairchild Trust (10.56%), Patrick Sherrill (13.11%), and Jenifer Vellucci (3.25%).

## 3. SIGNIFICANT EVENTS IN CHAPTER 11 CASE[2]

### 3(a) Automatic Stay; Administrative Status

The Chapter 11 Case is assigned to the Honorable George B. Nielsen, United States Bankruptcy Judge for the District of Arizona. Since the Petition Date, the Debtor has operated as debtor-in-possession under Bankruptcy Code §§ 1107 and 1108. The Debtor hired Perkins Coie LLP as its general bankruptcy counsel.

An immediate effect of the commencement of the Chapter 11 Case was the imposition of the automatic stay under Bankruptcy Code §362 that, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against the Debtor's property, and the commencement or continuation of litigation against the Debtor. This relief provided the Debtor with the "breathing room" necessary to pursue its business objectives in the Chapter 11 Case without undue pressure or litigation by Creditors. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until the Effective Date of the Plan.

On June 20, 2016, the United States, on behalf of RUS, filed the *United States' Motion with Supporting Authorities for Relief from the Automatic Stay to Foreclose* (the "*Lift/Stay Motion*") [D.I. 266], pursuant to which the United States sought authority to foreclose on the assets on which RUS held a lien. The Bankruptcy Court has postponed the preliminary hearing on the Lift/Stay Motion until December 14, 2016.

### 3(b) FCC Rule Changes

At the end of 2014, the Debtor obtained highly important information regarding rule changes by the FCC that significantly and negatively affect the Debtor's USF support beginning on January 1, 2015. On December 11, 2014, the FCC formally adopted an order implementing long-anticipated rule changes to USF "high-cost loop" support—changes that the Debtor has taken into account in preparing the financial projections underlying the Plan and included with this Disclosure Statement. The FCC's formal adoption of these rule changes clarifies the new calculation for certain elements of the Debtor's future USF support.

On March 30, 2016, the FCC issued an order pertaining to USF that again substantially affected the Debtor's likely future revenues. Two matters addressed in that order proved to be less detrimental to the Debtor's future as the Debtor's management and cost consultants had

---

[2] Certain factual and other information contained in this Article 3 was originally contained in the Debtor Disclosure Statement. The Plan Proponents have not undertaken an independent investigation to verify that certain of the information contained in the Article 3 is accurate.

previously expected. A third matter addressed in the order and subsequently by the FCC may have a detrimental impact on the Debtor's future revenues and capital expenditures.

First, the order established a formula for adjustments to USF for "partial competitive overlap"—that is, the extent to which a rural telecom provider's service area overlaps with the service area covered by a competitor telecom provider. The Debtor has a substantial portion of its served establishments subject to competitive overlap, so the Debtor had grave concerns that this aspect of the FCC order would have severely negative implications for the Debtor's future USF revenues. The FCC's newly-promulgated formula, however, indicates that, although still negative, the effects of the new formula on the Debtor's revenues will not be as severe as originally feared.

Second, the FCC order addresses authorized rate-of-return for investments in physical plant by those rural telecom providers that select rate-of-return treatment for calculation of USF. The Debtor's previous revenue forecasts assumed a rate of 8%, implemented immediately on FCC action. The March 2016 FCC order, however, proposed a rate of 9.75% with a six-year transition. Although this is lower than the 11.25% rate of return that the Debtor previously enjoyed, the effect of the FCC order on the Debtor's future revenues is not expected to be as severely negative as originally feared.

Third, the FCC order provides legacy rate of return carriers like the Debtor with the option to continue to receive USF support under rules adopted in 2011 under a revised legacy support mechanism or voluntarily elect on November 1 to receive model-based USF support for a term of 10 years in exchange for meeting certain broadband build-out requirements. For those carriers not electing on November 1 to receive model-based USF support, the FCC adopted broadband deployment obligations that were tailored to the unique circumstances of each rate of return carrier. The Debtor had determined that it would not be required to meet additional broadband deployment obligations under the legacy rate of return requirements because it had deployed broadband to more than 80% of its relevant service area. However, on September 19, 2016, the FCC's Wireline Competition Bureau issued a Public Notice (DA-16-1053) in WC Docket No. 10-90 in which it calculated that the Debtor deployed broadband to approximately 60% of its relevant service area, meaning that the Debtor would be required to deploy additional capital to increase its broadband coverage under both the legacy rate of return support mechanism and the model-based USF requirement. Depending on the election made by Debtor on November 1, 2016 for receipt of USF support, it is possible that Reorganized Accipiter's level of USF support will be below the predicted levels and it also is possible that Reorganized Accipiter will have to deploy substantial additional capital to meet the applicable FCC broadband build out requirement.

The Debtor must make the election between USF model based support or legacy USF support on November 1, 2016. On November 1, 2016, the Debtor elected to receive USF model based support. Although it is extremely difficult to quantify such costs based on the available information, it is possible that as a result of this election the Debtor or Reorganized Accipiter will have to deploy substantial additional capital over the next ten years to meet the FCC's broadband build out requirements, without corresponding additional revenues to offset the additional capital requirements. See 10 Risk Factions 10(a) Generally – *Regulatory Environment.*

The Debtor's revenue forecasts outlined in the Debtor Disclosure Statement and attached hereto take into account all FCC rule-making as of June, 2016, including the March 2016 order and are, therefore, substantially different from the forecasts that provided the foundation for the

Debtor's previous plans filed in this case but not do take into account the Public Notice or the USF support mechanism to be selected by the Debtor. The revenue forecasts, however, are still subject to variability related to the manner in which FCC rules are implemented, the impact on the Debtor's other revenue streams, as well as unquantifiable FCC action on proposed future USF rule-making.

**3(c) Sale Efforts**

From the outset of its Chapter 11 case, the Debtor considered all alternatives to maximize recoveries for all its creditors. One alternative long considered was a sale of the Debtor's operating assets as a going concern under Bankruptcy Code § 363. The Debtor determined early in the case that any sale of assets under Bankruptcy Code § 363 would all but destroy a purchaser's ability to realize historic USF revenue following the sale, owing to FCC rules that base USF entitlement to the cost basis for a provider's operational assets. The Debtor's assets continue to carry a book value for USF purposes of approximately $23 million and the Debtor's USF revenues are calculated based on that book value. If, however, a buyer of the Debtor's assets paid a fraction of that book value to acquire the assets in a § 363 sale, the Debtor has long believed that the FCC would adjust that buyer's cost basis to the purchase price, radically reducing USF revenues to be point where the operation of the purchased business is essentially unsustainable. Importantly, the FCC itself confirmed to the Debtor in October 2015 that the FCC agrees with the Debtor's interpretation of the applicable rules regarding the adjustment of cost basis and the resulting negative effect on USF support.

For these reasons, the Debtor was unable for many months to locate any parties interested in a purchase of the Debtor's assets under Bankruptcy Code § 363. Despite that failure, the Debtor agreed with the Committee and RUS to establish a comprehensive virtual data room containing all relevant information about the Debtor's operations, regulatory circumstances, licenses, and revenues from all sources so that any party (who executed a standard confidentiality agreement) interested in a transaction pertaining to the Debtor's assets could access all diligence materials available. Over the course of several months during the second half of 2015, the Debtor entertained various levels of interest in an asset transaction by more than a dozen third parties.

Ultimately, four entities signed confidentiality agreements and obtained full access to the virtual data room. One entity, a telecom provider known as USConnect, provided to the Debtor a letter of interest in November 2015, outlining basic terms for a purchase of the Debtor's assets under Bankruptcy Code § 363. Following that letter of interest, USConnect provided the Debtor with a draft asset purchase agreement in February 2016 and commenced a lengthy period of negotiations with the Debtor regarding all terms of a § 363 asset sale.

Despite months of negotiations, the Debtor was unable to obtain acceptable terms from USConnect on an asset purchase agreement. Although generally supportive of an asset sale initially, the Committee withdrew its support for an asset sale to USConnect when it learned that USConnect was unwilling to accommodate any approach to the sale that would enable all the Debtor's critical trade vendors and business partners—the vast majority of the unsecured creditors in this case—to obtain any recovery from the sale short of extremely costly and lengthy litigation against RUS. In short, the Debtor strongly believes that a sale of the Debtor's assets to USConnect under the terms on which USConnect insisted would produce a considerably lower recovery for all creditors—including RUS—than the Plan.

Having received no other serious expressions of interest in an alternative transaction and having reached an impasse with USConnect on the terms of an asset sale, as discussed below, the Debtor and the Committee formulated the Debtor Plan and proposed it for confirmation.

**3(d) Filing and Withdrawal of the Debtor Plan**

The Debtor has used its operating cash—cash RUS claims as its cash collateral—in accordance with a series of stipulated orders containing agreements between the Debtor and RUS and requiring, among other things, for the Debtor to make monthly Adequate Protection Payments. The Debtor paid approximately $79,000 per month in Adequate Protection Payments from shortly after the inception of the Chapter 11 Case until December 2015, when it reduced these payments to approximately $19,000 per month. The stipulated cash collateral orders reserved the Debtor's estate's rights to seek a determination from the Bankruptcy Court that RUS was not entitled under Bankruptcy Code §506(b) to receive post-Petition Date interest and that, therefore, some or all the Adequate Protection Payments should be attributed to pre-Petition Date principal owing to RUS.

In January 2015, the Committee filed the Adversary Proceeding under which the Committee, on the Estate's behalf, seeks, among other things, to equitably subordinate the RUS Claims to the claims of all creditors and, alternatively, to re-characterize the RUS Claims as Equity Interests. As set forth in more detail below, prior to the Effective Date, the Bankruptcy Court shall enter an order dismissing the Adversary Proceeding with prejudice, which dismissal shall become effective only upon the Effective Date and payment of the Purchase Price, and the Debtor, the Committee and RUS shall each execute and deliver written releases of the other parties to the Adversary Proceeding which shall be effective only upon the Effective Date and payment of the Purchase Price.

The Debtor has spent its time in this Chapter 11 Case operating its business and growing its subscriber base as part of a long-term effort to steadily reduce its dependence on USF support and increase non-subsidy revenue, a strategy designed to ensure the long-term viability of the Debtor's operations and its continued ability to service its rural customers.

At the same time, the Debtor has engaged in many months of often intense negotiations with RUS regarding the terms of a mutually-agreeable restructuring of the RUS debt. The Debtor, although unable to reach agreement with RUS, nevertheless filed the Debtor Plan and the Debtor expected RUS to oppose confirmation of the Plan. The Debtor, however, was successful in negotiating with the Committee an acceptable treatment of General Unsecured Claims, as set was set forth in the Debtor Plan.

A hearing seeking approval of Debtor Disclosure Statement was originally scheduled for August 11, 2016 and subsequently was adjourned to September 15, 2016 [D.I. 280]. Prior to that hearing, in light of the Stock Purchase Proposal (defined and described in more detail below), on September 12, 2016 [D.I. 295], the Committee withdrew its support of the Debtor Plan and the Debtor, on September 13, 2016 [D.I. 296], withdrew the Debtor Plan without prejudice.

**3(e) Significant Events Leading up to the Filing of the Plan**

During the Chapter 11 Cases, on August 14, 2015, the Purchaser and the Debtor entered into a non-disclosure agreement whereby the Purchaser was able to consider the business opportunity presented by the Debtor's bankruptcy. Subsequently, the Purchaser determined not to pursue the matter any further at that time. It was not until June 2016 that the Purchaser made

the decision to again investigate the business opportunity associated with the Debtor's bankruptcy. The Debtor's management agreed to meet with members the Purchaser's team to discuss the Chapter 11 Case. After conducting on- and off-site diligence, the Purchaser submitted a letter of intent to the Debtor and the Committee, dated July 18, 2016, whereby the Purchaser outlined certain terms and conditions by which the Purchaser would acquire 100% of the New Common Stock of Reorganized Accipiter on the Effective Date for $5.25 million (the "*Stock Purchase Proposal*").

While waiting to hear back from the Debtor, the Purchaser continued discussions with the Committee regarding whether the Committee would support the Stock Purchase Proposal. On August 31, 2016, the Purchaser sent a letter to the Committee further outlining the terms of the Stock Purchase Proposal. Ultimately, the Committee determined to support the Stock Purchase Proposal and withdrew its support of the Debtor Plan. The Committee is a co-proponent of the Plan.

In addition to discussing the Stock Purchaser Proposal with the Debtor and the Committee, the Purchaser also discussed with RUS the potential treatment of the RUS Loan Claims.

## 4. DESCRIPTION OF THE PLAN

### 4(a) Introduction

This section provides a summary of the Plan's structure, classification, treatment, and implementation. Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to in the Plan, this Disclosure Statement is not a precise or complete statement of all the terms and provisions of the Plan or documents referred to in the Plan. Refer to the Plan and its exhibits for a complete statement of all the Plan's terms.

The Plan itself and the documents it refers to will control the treatment of holders of Claims against, and Equity Interests in, the Debtor under the Plan and will, on the Effective Date, be binding on all parties-in-interest, including holders of Claims against, and Equity Interests in, the Debtor. The Plan is designed to effect a reorganization of the Debtor's business operations and a restructuring of the Debtor's obligations to its Creditors.

### 4(b) Summary of Claims Process, Bar Date, and Professional Fees

The Bankruptcy Court entered an order (the "*Bar Date Order*") setting June 27, 2014 as the deadline for filing proofs of claim against the Debtor (the "*Bar Date"*). The Bar Date does not apply to certain types of Claims, including Administrative Claims, Professional Fee Claims, and Rejection Claims arising after the Bar Date, as to which the bar date is controlled by provisions of the Plan and orders of the Bankruptcy Court authorizing the rejection of contracts or leases. Notice of the Bar Date was mailed to each person listed in the Schedules along with a copy of the Bar Date Order and a proof of claim form.

All Administrative Claims, Professional Fee Claims and Rejection Claims must be filed on or before the date that is the first Business Day that is 30 days after the Effective Date.

**4(c) Classification of Claims and Equity Interests**

Bankruptcy Code §1122 requires that a plan classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan may place a claim of a creditor or an interest of an equity holder in a particular class only if the claim or interest is substantially similar to the other claims or interests of that class. The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest.

The Plan Proponents believe that they have classified all Claims and Equity Interests in compliance with the requirements of the Bankruptcy Code. If a holder of a Claim or Equity Interest challenges the Plan's classification of Claims or Equity Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponents, to the extent permitted by the Bankruptcy Court, intend to modify the classifications of Claims or Equity Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation. Except if a modification of classification adversely affects the treatment of a holder of a Claim or Equity Interest, acceptance of the Plan by any holder of a Claim or Equity Interest will be deemed to be a consent to the Plan's treatment of the holder of a Claim or Equity Interest regardless of the class as to which that holder ultimately is deemed to be a member.

**4(d) Treatment of Unclassified Claims**

As provided in Bankruptcy Code §1123(a)(1), Administrative Claims and Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of Administrative Claims and Priority Tax Claims are not entitled to vote on the Plan but, rather, are treated separately in accordance with Sections 2.02 through 2.05 of the Plan and under Bankruptcy Code §1129(a)(9)(A).

4(d)(1) *Allowed Administrative Claims*

An Administrative Claim is a Claim for any cost or expense of administration of the Chapter 11 Case Allowed under Bankruptcy Code §§503(b), 507(b) or 546(c)(2) and entitled to priority under Bankruptcy Code §507(a)(2), including: (a) fees payable under 28 U.S.C. §1930; (b) actual and necessary costs and expenses incurred in the ordinary course of the Debtor's businesses; (c) actual and necessary costs and expenses of preserving the Estates or administering the Chapter 11 Case; and (d) all Professional Fee Claims to the extent Allowed by Final Order under Bankruptcy Code §§330, 331, or 503.

4(d)(2) Priority Tax Claims

These are Claims of a Governmental Unit for taxes entitled to priority under Bankruptcy Code §507(a)(8).

4(d)(3) Professional Fees

Claims for Professional Fees are Claims of Professionals, including an entity (a) employed in the Chapter 11 Case in accordance with an order of the Bankruptcy Court under Bankruptcy Code §§327, 328, 363, or 1103 and to be compensated for services under Bankruptcy Code §§327, 328, 329, 330, and 331 or order of the Bankruptcy Court; or (b) for

whom compensation and reimbursement has been Allowed by a Final Order under Bankruptcy Code §503(b).

The Debtor has paid significant portions of the Professional Fee Claims on an interim basis during the Chapter 11 Case in accordance with Bankruptcy Court orders. Not counting the amounts already paid on an interim basis, it is estimated that, assuming an Effective Date of March 31, 2017, unpaid Professional Fee Claims will total approximately $326,000.

4(d)(4) Treatment.

(A) *Allowed Administrative Claims.* Unless otherwise agreed to by the holder of the Claim and the Purchaser or Reorganized Accipiter, as applicable, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Administrative Claim, each Allowed Administrative Claim (other than a Professional Fee Claim) is paid in full in Cash (or otherwise satisfied in accordance with its terms) on the latest of: (a) the Effective Date, or as soon after that date as feasible; (b) any date the Bankruptcy Court may fix, or as soon after that date as feasible; or (c) 30 days after the Claim is Allowed.

(B) *Preserved Ordinary Course Administrative Claims.* Each Allowed Preserved Ordinary Course Administrative Claim is paid in full in Cash at Reorganized Accipiter's election either: (a) in accordance with the terms and conditions under which the Claim arose; or (b) in the ordinary course of Reorganized Accipiter's business. Payments are made without further action by the holder of the Preserved Ordinary Course Administrative Claim.

(C) *Allowed Priority Tax Claims.* Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of (i) the Purchaser, if before the Effective Date or (ii) Reorganized Accipiter, on or after the Effective Date, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (b) treatment in any other manner such that its Allowed Priority Tax Claim shall not be Impaired, including equal annual installment payments in Cash of an aggregate value, as of the Effective Date, equal to the Allowed amount of such Claim, over a period ending not later than five (5) years after the Petition Date. If any Allowed Priority Tax Claim is secured by a Lien on any property of the Estate under applicable non-bankruptcy law, the holder of that Claim retains the Lien it held as of the Petition Date securing the Claim until the Claim is paid in full. On satisfaction of the Secured Tax Claim, the claimholder must release its Lien in accordance with applicable non-bankruptcy law.

(D) *Professional Fee Claims.* All requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Debtor, Reorganized Accipiter, counsel to Reorganized Accipiter, the United States Trustee, counsel to the Plan Proponents and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than the Professional Fee Bar Date. Holders of Professional Fee Claims that are required to file and serve applications for final allowance of their Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtor, Reorganized Accipiter or their respective properties, and such Professional Fee Claims shall be deemed discharged. Objections to any Professional Fee Claims

must be filed and served no later than twenty (20) days following the filing with the Court of any request for compensation or reimbursement of Professional Fee Claims.

All reasonable fees and expenses incurred by Professionals after the Effective Date in furtherance of the Plan, the preparation, filing, and review of Professional Fee Claims, the prosecution of Avoidance Actions and Litigation Claims, and the resolution of Disputed Claims, shall be paid by Reorganized Accipiter on its receipt of an invoice, or on other terms Reorganized Accipiter and the Professional agree on, without the need for further Bankruptcy Court authorization or entry of a Final Order. Reorganized Accipiter may dispute and not pay any Professional fees incurred after the Effective Date. The Bankruptcy Court retains jurisdiction to resolve any such disputes.

**4(e) Treatment of Classified Claims and Interests**

In accordance with Bankruptcy Code §1123(a)(1), set forth below is a designation of classes of Claims against, and Equity Interests in, the Debtor (except the unclassified Claims receiving the treatment described in Section 4(d) above). A Claim or Equity Interest is placed in a particular Class for the purpose of receiving distributions in accordance with the Plan only if that Claim or Equity Interest has not been paid, released, or otherwise settled before the Effective Date. The treatment of classified Claims and Equity Interests and the provisions governing distributions on account of Allowed Claims and Allowed Equity Interests is set forth in Articles 3 and 4 of the Plan. You should refer to the Plan itself for the complete provisions governing the treatment of your particular Claim or Equity Interest.

4(e)(1) Class 1 (Priority Claims)

Class 1 consists of all Allowed Priority Claims other than Priority Tax Claims. Class 1 is unimpaired by the Plan. All holders of Allowed Priority Claims are deemed to have accepted the Plan and will not be solicited to vote on the Plan. Each holder of an Allowed Priority Claim other than a Priority Tax Claim receives Cash in an amount equal to its Allowed Priority Claim on the later of: (i) the Effective Date, or as soon after that date as feasible; and (ii) 30 days after the Priority Claim is Allowed; unless, before the later of those two dates, the holder of the Claim and Reorganized Accipiter agree in writing to a different date.

Based on information provided by the Debtor in the Debtor Disclosure Statement, the Plan Proponents believe there are two small Priority Claims totaling approximately $400.

4(e)(2) Class 2 (Miscellaneous Secured Claims)

Class 2 consists of all Allowed Secured Claims that are not Secured Tax Claims or the RUS Claims. Class 2 is unimpaired by the Plan. All holders of Allowed Miscellaneous Secured Claims are deemed to have accepted the Plan and will not be solicited to vote on the Plan. Each holder of an Allowed Miscellaneous Secured Claim in Class 2 receives Cash in an amount equal to its Allowed Miscellaneous Secured Claim from the proceeds of the collateral to which the claim pertains on the later of: (i) the Effective Date, or as soon after that date as feasible; and (ii) the closing date of the sale of the collateral to which the claim pertains; unless, before the later of those two dates, the holder of the Claim and Reorganized Accipiter agree in writing to a different date. Each holder of an Allowed Miscellaneous Secured Claim retains all Liens on applicable property of the Estate arising under applicable law until that holder's Allowed Miscellaneous Secured Claim is paid in full under the Plan.

Based on information provided by the Debtor in the Debtor Disclosure Statement, the Plan Proponents are unaware of any Miscellaneous Secured Claims.

4(e)(3) Class 3 (RUS Loan Claims)

Class 3 consists of all Allowed RUS Loan Claims. Class 3 is impaired. All holders of Allowed Class 3 Claims are entitled to vote on the Plan.

Under the Plan, the RUS Loan Claims are Allowed in the aggregate amount of $20,755,214.00. On or as soon as is reasonably practicable after the Effective Date but in no event later than 5 business days, in full and final satisfaction of the RUS Loan Claims, the holder(s) of the RUS Loan Claims shall receive a Cash payment of $5,250,000 and all liens held on account of the RUS Loan Claims shall be released, and shall be deemed released, by RUS. For the avoidance of doubt, RUS shall execute any such release or other necessary documents to evidence and effectuate the release of its liens requested by the Purchaser.

4(e)(4) Class 4 (General Unsecured Claims)

Class 4 consists of all Allowed General Unsecured Claims, including Rejection Claims. Class 4 is impaired. All holders of Allowed Class 4 Claims are entitled to vote on the Plan.

Each holder of an Allowed General Unsecured Claim receives, in full and final satisfaction of its Allowed General Unsecured Claim, payment in full in Cash of its Allowed General Unsecured Claim as follows: (i) its *pro rata* share of $200,000, to be distributed on or as soon as reasonably practicable after the Effective Date but in no event later than 5 business days after the Effective Date so long as such creditor has provided Reorganized Accipiter with a completed W-8 or W-9 tax form and (ii) payment of the balance of its Allowed General Unsecured Claim as soon as is practicable but, in any event, no later than in eight equal monthly installments commencing on the first Business Day one month from the Effective Date, in all cases to be distributed on a *pro rata* basis. Reorganized Accipiter may prepay any Allowed General Unsecured Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without affecting the timing of payments on account of any other Allowed General Unsecured Claim. The Installment Payments shall be secured by a first lien on the Office Building in favor of the Unsecured Creditor Trustee, who shall be selected by the Committee and identified in the Plan Supplement.

Based on information provided by the Debtor in the Debtor Disclosure Statement, the Plan Proponents believe that, as of the assumed Effective Date of March 31, 2017, and assuming that the Estate prevails on the limited number of expected objections to filed proofs of claim, Allowed General Unsecured Claims will total approximately $610,000.

4(e)(5) Class 5 (Equity Interests and Equity Related Claims)

Class 5 consists of all Equity Interests and Equity Related Claims. Under Bankruptcy Code §510(b), each Equity Related Claim is subordinated to all Claims or Equity Interests senior or equal to the Claim or Equity Interest represented by the Equity Related Claims. As of the Effective Date, all Equity Interests and Equity Related Claims are extinguished. The holders of Equity Interests and Equity Related Claims do not receive or retain any rights, property, or distributions on account of their Equity Interests or Equity Related Claims. In light of this treatment, Class 5 is impaired by the Plan but all holders of Equity Interests and Equity Related Claims are deemed to reject the Plan without voting.

## 5. PLAN IMPLEMENTATION

**5(a) Effective Date Funding**

**Sources of Cash for Plan Distributions**. All Cash necessary for Reorganized Accipiter to make payments pursuant to the Plan shall be obtained from existing Cash balances of the Debtor and Reorganized Accipiter (including the payment of the Purchase Price by the Purchaser) and the operations of the Debtor or Reorganized Accipiter, as applicable. Cash payments on account of Allowed Claims under the Plan and any Cure required under Section 5.03 of the Plan, are made from Reorganized Accipiter's Cash.

**Exit Facility**. On the Effective Date, Reorganized Accipiter shall enter into a guarantee of the Exit Facility. The Exit Facility shall be substantially in the form, or on the terms, set forth in the Plan Supplement, and shall be in form and substance acceptable to the Purchaser. Among other terms, the security granted by Reorganized Accipiter to the lender in connection with its guarantee of the Exit Facility shall include a specific and limited lien subordination on the Office Building. Such Office Building lien will be provided as security for the Installment Payments required to be made to the holders of General Unsecured Claims under Article 3.04 of the Plan.

**5(b) Restructuring Transactions.**

On the Effective Date, 100% of the New Common Stock for Reorganized Accipiter will be issued to the Purchaser in exchange for the Purchase Price pursuant to the terms of the Plan. As of the Effective Date, Reorganized Accipiter shall be deemed to have assumed and to have agreed to pay, perform and satisfy all liabilities that become Allowed Claims that are to receive distributions and are not discharged under the Plan.

**5(c) Formation of the Unsecured Creditor Trust.**

On the Effective Date, the Unsecured Creditor Trust shall be formed in order to hold the lien granted on behalf of Class 4 unsecured creditors to secure the Installment Payments. The Committee shall select the Unsecured Creditor Trustee. The selection of the Unsecured Creditor Trustee, and any governing documents related thereto, shall be filed as part of the Plan Supplement.

**5(d) Dismissal of Adversary Proceeding.**

Prior to the Effective Date, the Bankruptcy Court shall enter an order dismissing the Adversary Proceeding with prejudice, which dismissal shall become effective only upon the Effective Date and payment of the Purchase Price, and the Committee and RUS shall each execute and deliver written releases of the other parties to the Adversary Proceeding which shall be effective only upon the Effective Date and payment of the Purchase Price.

**5(e) Claims Administration.**

**General**. As of and following the Effective Date, Reorganized Accipiter shall have the sole authority (a) to file, withdraw, or litigate to judgment objections to Claims or Equity Interests, (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements, withdrawals or compromises without any further notice to or action, order or

approval by the Bankruptcy Court. Notwithstanding the foregoing, Reorganized Accipiter shall not object to any of the Claims identified on the Claims Schedule attached as **Appendix 5** hereto and, to the extent any such Claim (i) is not the subject of an objection by the Debtor or another party in interest on the Effective Date or (ii) has not been Disallowed by order of the Court, such identified Claims shall be deemed Allowed Claims on the Effective Date.

**Objections to Claims**. Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed before the Effective Date, Reorganized Accipiter may object to the allowance or seek estimation of any Claim against the Debtor on any grounds permitted by the Bankruptcy Code. Nothing in this section affects any party-in-interest's right to object to the allowance of any Claims or to seek the subordination of any Claim on any grounds permitted by the Bankruptcy Code. All objections to Claims must be brought by filing the appropriate pleading in the Bankruptcy Court before the first Business Day that is 180 days after the Effective Date, but the Bankruptcy Court may approve a later date on Reorganized Accipiter's motion filed (but not necessarily heard) before the first Business Day that is 180 days after the Effective Date.

**Disallowance of Certain Claims.** Any Claims held by Persons from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or by a Person that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Persons may not receive any distributions on account of their Claims until such time as such causes of action against such Persons have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtor by such Person have been turned over or paid to Reorganized Accipiter.

**Contingent Claims**. Until a Contingent Claim becomes an Allowed Claim or is Disallowed, the Claim is treated as a Disputed Claim for all purposes under the Plan. The holder of a Contingent Claim is entitled to a distribution under the Plan only when the Contingent Claim becomes an Allowed Claim. Any Contingent Claim for reimbursement, indemnification or contribution held by a Person that may be liable with the Debtor on a Claim of a Creditor is Disallowed as of the Effective Date if: (a) that Creditor's Claim is Disallowed; (b) the Claim for reimbursement, indemnification or contribution is contingent as of the Effective Date; or (c) that Person asserts a right of subrogation to the rights of the Creditor under Bankruptcy Code § 509.

### 5(f) Restated Governance Documents

As of the Effective Date and without any further action by the directors of the Debtor or Reorganized Accipiter, the Debtor's corporate governance documents are amended and restated substantially in the forms of the Restated Governance Documents. The Restated Governance Documents, among other things, authorize the issuance of the New Common Stock and prohibit (to the extent required by Bankruptcy Code § 1123(a) and (b)) the issuance of non-voting equity securities. After the Effective Date, Reorganized Accipiter may amend its corporate governance documents as permitted by applicable law.

### 5(g) Section 1145 Exemption

In accordance with Bankruptcy Code § 1145, the issuance of the New Common Stock under the Plan is exempt from all federal, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in a security.

## 5(h) Post-Confirmation Management

**Initial Board of Directors**. The initial board of directors of Reorganized Accipiter as of the Effective Date comprises three directors: (1) Michael B. Urdahl; (2) J. Thomas Shoemaker; and (3) Dwight 'Doc' Wininger. The members of the Initial Board of Directors will not receive any compensation for serving in such director role.

**Initial Officers**. The initial officers of Reorganized Accipiter as of the Effective Date are: (1) Michael B. Urdahl, President and Chief Executive Officer; (2) Chris Karn, Chief Operations Officer, (3) Bachtiyer Kholmatov, Chief Financial Officer, (4) J. Thomas Shoemaker, Chief Technical Officer, and (5) Dwight 'Doc' Wininger, Executive Vice President, External Affairs. One or more of the Initial Officers may receive some or part of their compensation from Reorganized Accipiter, based on allocation of work performed on behalf of Reorganized Accipiter and other Pinpoint affiliates post-Effective Date.

The biographies of each of the proposed members of the Initial Board of Directors and Initial Officers are set forth below:

**Michael B. Urdahl**: Mike Urdahl currently serves as President and CEO of Pinpoint Holdings, Inc. Mike has been in the communications industry since 1984 and previously spent 22 years as Vice President of Operations and Government Affairs at Great Plains Communications in Nebraska. Mike held various roles which involved all aspects of operations, including outside plant, engineering, cable TV, marketing, and Internet services. He also spent many years representing the company at the Nebraska Public Service Commission and the Nebraska Unicameral, as well as the US Congress and the Federal Communications Commission. Mr. Urdahl also spent 5 years as part of the senior management team for Signal Telcom Partners. Signal owned and operated rural Independent local exchange carriers in 7 states. In this role, Mike oversaw all aspects of the companies, including capital expenditures, regulatory compliance, and day-to-day operations.

**Chris Karn**: Mr. Karn has over 25 years of management experience in the cable and telecommunications industry. Karn started his career in the cable industry and has managed large and small cable operations across the United States. He has worked for companies such as Tele-Communications Inc., and Charter Communications. Karn has vast experience in building and operating cable networks, fiber and lit services networks, as well as wireless microwave backhaul networks. Karn serves as the COO for Pinpoint Holdings, Inc. and President of Pinpoint Services, Inc. In his role as president, he oversees the day to day operations of Pinpoint Services that focuses on tower services such as line and antenna, tower modifications, service works and well as full turnkey civil solutions. As COO, he oversees the day to day operations of the various operating entities the company serves, as well as playing a key role in business development.

**Bachtiyer Kholmatov**: Bachtiyer is the Chief Financial Officer (CFO) of Pinpoint Holdings, Inc. Mr. Kholmatov joined Pinpoint in 2008 as VP Finance and was promoted to CFO position in 2010. He is responsible for the oversight of all financial affairs of Pinpoint companies, strategic financial planning, M&A activities as well as management of Finance/Accounting team. Mr. Kholmatov has over 20 years of professional experience. Prior to joining Pinpoint he held positions in finance and accounting roles in various industries including international trade, food processing/manufacturing, IT/software and consulting services. Mr. Kholmatov holds an MBA from the University of Nebraska-Lincoln with emphasis in Finance; and BA in Economics from Novosibirsk State University (Russia).

**J. Thomas Shoemaker**: Tom currently serves as Executive Vice President of Pinpoint Communications Inc., Cambridge Telephone Company and Pinpoint Wireless, Inc. d/b/a BLAZE Wireless. As Executive Vice President, he is in charge of the day to day operations of the sister companies. He is responsible for expanding and improving the retail businesses associated with the Pinpoint companies. He also is directly involved with the regulatory processes that impact the business. He deals directly with the Nebraska Public Service Commission, Federal Communications Commission, USAC, NECA, as well as other local and national regulatory bodies and telecom industry organizations. Shoemaker also plays an instrumental role in expanding Pinpoint's competitive markets. This includes deploying Voice, Video, and Data services in new locations including the most recent wireless and IPTV launches in Southwest Nebraska. Mr. Shoemaker has been in the telecom industry for 15 years. He holds a Bachelor of Science Degree of Business Administration from Ashford University.

Tom has been employed by Pinpoint for 15 years. He is active in the local Economic Development Corporation, is the past President of the Cambridge Community Investment Group, LLC, is the Chairman of the Nebraska Telecommunications board of directors and is on the Wireless E911 advisory council.

**Dwight 'Doc' Wininger**: Dwight 'Doc' Wininger became Executive Vice-President, External Relations of Pinpoint Holdings, Inc., effective January 1, 2016. Before that, he had served as Executive Vice-President, External Relations and Vice-President for Governmental Relations and Business Development for Pinpoint Holdings, Inc., since September 1, 2012. Before assuming his position at Pinpoint, Wininger had more than 30 years of telecommunications policy experience as an employee at the Nebraska Legislature, the Nebraska Public Service Commission and in the telecom industry in Nebraska. Wininger started as a Legislative Aide in 1980 and spent eight years working for the Speaker of the Legislature and the Banking, Commerce and Insurance Committee Chairman. From early 1988 until late 1994, he served as the Executive Director of the Nebraska Public Service Commission. He then spent two years as President of the Nebraska Telecommunications Association. Immediately prior to coming to Pinpoint, for 16 years Wininger was President of SBW Consulting, a division of Strain, Slattery Barkley, CPAs, a Lincoln-based firm providing services to Independent telecommunications providers. As President of SBW Consulting, he was responsible for developing policy strategies for his clients as well as assisting clients with their strategic planning. He is generally recognized as a preeminent Nebraska expert in rural telecommunications policy and is routinely called on to present seminars to policy makers and their staffs on telecommunications policy and finance history. He holds a Bachelors of Science Degree from Nebraska Wesleyan University (History) and a Masters of Public Administration (with an emphasis in Public Policy) from the University of Nebraska at Omaha.

In addition to his work in telecommunications, Wininger is also well known in the athletic community. Since 1988, he has announced more than 1000 high school and college athletic contests and has been the Public Address Announcer for NSAA State football, girls and boys basketball and baseball championships for more than 20 years. He is also the current PA Announcer for the University of Nebraska-Lincoln's men's basketball team.

## 6. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 6(a) Assumption and Rejection of Contracts and Leases

All executory contracts and unexpired leases will be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except those executory contracts and unexpired leases that (i) are designated as an exhibit to the Plan Supplement as assumed, (ii) have been assumed by a separate Final Order of the Bankruptcy Court, (iii) are the subject of a motion to assume pending on the Effective Date or are (iv) assumed pursuant to the terms of the Plan. The listing of a document in the Plan Supplement shall not constitute an admission by the Debtor or the Plan Proponents that such document is an executory contract or an unexpired lease or that the Debtor or Reorganized Accipiter has any liability thereunder.

Entry of the Confirmation Order constitutes: (a) the approval under Bankruptcy Code § 365 of the assumption of the executory contracts and unexpired leases assumed under the Plan; and (b) the approval under Bankruptcy Code § 365 of the rejection of the executory contracts and unexpired leases rejected under the Plan. Notwithstanding anything contained in this Section 5.02 to the contrary, the Plan Proponents may, with the consent of the Purchaser, amend the Plan Supplement to add or change the treatment (assumed or rejected) of any executory contract or unexpired lease, thus changing the treatment of the contract or lease under the Plan, at any time before the Effective Date.

### 6(b) Cure of Defaults

On the Effective Date or as soon after as is feasible, Reorganized Accipiter must Cure any defaults under any executory contract or unexpired lease assumed under the Plan. Any monetary Cure required for the assumption of a particular contract or lease is indicated on an exhibit to the Plan Supplement. Any non-Debtor party to any such contract or lease that disputes the amount of Cure indicated on to the Plan Supplement exhibit must file a written objection with the Bankruptcy Court no later than the deadline for objecting to confirmation of the Plan. If the Plan Supplement exhibit is modified to add an executory contract or unexpired lease to be assumed less than 7 business day prior to the deadline for objecting to confirmation of the Plan, the non-Debtor party to such contract or lease shall have 7 business days to file an objection to the proposed Cure amount. Any such objections not raised in that manner are waived. The Debtor or Reorganized Accipiter will not, and need not as a condition to assuming any executory contract or unexpired lease under the Plan, Cure any default that need not be cured under Bankruptcy Code § 365(b).

### 6(c) Rejection Claims Bar Date

All Rejection Claims must be filed by the Rejection Claims Bar Date. Any Rejection Claim not filed by the Rejection Claims Bar Date is forever barred. All Rejection Claims are General Unsecured Claims under the Plan. With respect to any executory contract or unexpired lease rejected by the Debtor before the Effective Date, the deadline for filing a Rejection Claim remains the deadline set forth in the order of the Bankruptcy Court authorizing that rejection. If the order did not contain such a deadline, the deadline for filing a Rejection Claim is 30 days after the Effective Date.

**6(d) Indemnification Obligations**

Any obligation of the Debtor to indemnify any Person serving as a fiduciary of any employee benefit plan of the Debtor under charter, by-laws, contract, or applicable state law is an executory contract and is rejected as of the Effective Date. Any obligation of the Debtor to indemnify, reimburse, or limit the liability of any Person, including any officer or director of the Debtor, or any agent, professional, financial advisor, or underwriter of any securities issued by the Debtor related to any acts or omissions occurring before the Petition Date is rejected under the Plan as of the Confirmation Date if the Effective Date occurs. Any Claim resulting from these rejections in favor of any Person must be filed by the Rejection Claims Bar Date and constitutes a General Unsecured Claim. Notwithstanding any of the foregoing, nothing contained in the Plan affects the rights of any Person covered by an applicable D&O Policy with respect to such policy.

**6(e) Benefit Plans**

All Benefit Plans not already assumed before the Confirmation Date are assumed as of the Effective Date if the Effective Date occurs, other than bonus plans and incentive plans. The Plan Supplement will include a list of any such bonus or incentive plans which will be assumed, if any. For the avoidance of doubt, to the extent any Benefit Plan requires that the Debtor grant equity interests to such employee, each such Benefit Plans shall be deemed modified such that no such equity interest grants are required under the terms thereof and any Equity Interests issued thereunder shall be deemed cancelled pursuant to the terms of the Plan. No Cure is required and no Cure will be made with respect to the assumption under the Plan of any Benefit Plan. Any non-Debtor beneficiary or participant in a Benefit Plan that disputes that no Cure is required for the assumption of the Benefit Plan must file an objection with the Bankruptcy Court no later than the deadline for objecting to confirmation of the Plan. Any such objections not raised in that manner are waived.

## 7. DESCRIPTION OF OTHER PROVISIONS OF THE PLAN

**7(a) Vesting of Assets**

Except as provided in the Plan or the Confirmation Order, all property of the Estate vests in Reorganized Accipiter on the Effective Date free and clear of all Liens and Claims existing before the Effective Date. From and after the Effective Date, Reorganized Accipiter may use and dispose of its property free of any restrictions of the Bankruptcy Code, including the employment of, and payment to, Professionals except as otherwise provided in the Plan or the Confirmation Order.

**7(b) Discharge**

Except as provided in the Plan or the Confirmation Order: (a) the rights granted under the Plan and the treatment of Claims and Equity Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims including any interest accrued on any Claim from the Petition Date; and (b) confirmation of the Plan discharges the Debtor and Reorganized Accipiter from all Claims or other debts that arose before the Effective Date to the fullest extent allowed under Bankruptcy Code § 1141(a), (b), (c), and (d)(1).

**7(c) Injunction**

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all entities that have held, currently hold, or may hold any Claim or Equity Interest are permanently enjoined from taking any of the following actions on account of any such Claim or Equity Interest: (i) commencing or continuing in any manner any action or other proceeding against any property to be distributed under the Plan; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any property to be distributed under the Plan; (iii) creating, perfecting, or enforcing any Lien or encumbrance against any property to be distributed under the Plan; and (iv) commencing or continuing any action that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.

Except with respect to the Adversary Proceeding and Claims that are Allowed under the Plan, nothing in the Plan: (i) extinguishes, prohibits, or otherwise limits the right of any holder of a Claim to assert a right to setoff or recoupment arising in connection with that Claim as part of the resolution and treatment of that Claim under the Plan; (ii) extinguishes, prohibits, or otherwise limits the right of the Estate or Reorganized Accipiter to assert and prevail on any Avoidance Action or Litigation Claim; (iii) enjoins or otherwise precludes any party-in-interest from enforcing the terms of the Plan and the Confirmation Order.

**7(d) Exculpation**

None of the Debtor, the Committee, the Purchaser, Reorganized Accipiter, or any of their respective members, officers, directors, employees, advisors, professionals, or agents has any liability to any holder of a Claim or Equity Interest for any post-petition act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, fraud, or gross negligence. In all respects, the Debtor, the Committee, the Purchaser, Reorganized Accipiter, and each of their respective members, officers, directors, employees, advisors, professionals, and agents are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

**7(e) Avoidance Actions and Litigation Claims**

All Avoidance Actions and Litigation Claims are retained and reserved for Reorganized Accipiter, which is designated as the Estate's representative under Bankruptcy Code § 1123(b)(3)(B) for purposes of the Avoidance Actions and Litigation Claims. Reorganized Accipiter has the sole authority to prosecute, defend, compromise, settle, and otherwise deal with any Avoidance Actions and Litigation Claims, and does so in its capacity as a representative of the Estate in accordance with Bankruptcy Code § 1123(b)(3)(B). Reorganized Accipiter will pay the fees and costs associated with litigating the Avoidance Actions and the Litigation Claims. Reorganized Accipiter has sole discretion to determine in its business judgment which Avoidance Actions and Litigation Claims to pursue, which to settle, and the terms and conditions of those settlements. Under Bankruptcy Code § 546(a), the time period for the Debtor (or any party on its behalf) to bring preference actions seeking to avoid certain pre-Petition transfers has expired and, accordingly, Reorganized Accipiter will not seek to pursue any such preference actions. Reorganized Accipiter reserves all rights to bring an Avoidance Action with respect to any Claim not identified on the Claims Schedule. For the avoidance of doubt, Reorganized Accipiter will not object to any Claim identified on the Claims Register, whether pursuant to an Avoidance Action or otherwise and such identified Claims shall not be considered Litigation Claims preserved for the benefit of Reorganized Accipiter.

**7(f) Retention of Jurisdiction After the Effective Date**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain as much jurisdiction over the Chapter 11 Case after the Effective Date as legally permissible including jurisdiction to:

- Allow, disallow, determine, liquidate, classify, estimate, or establish the amount, priority, or secured or unsecured status of any Claim, and resolve any request for payment of any Administrative Claim and any objection to the Allowance or priority of any Claim;

- Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

- Resolve any matters related to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party and to hear, determine and, if necessary, liquidate any Claims arising from such rejection;

- Ensure that distributions required under the Plan are accomplished in accordance with the Plan;

- Decide or resolve any motions, adversary proceedings, contested matters, and any other matters and grant or deny any applications or motions involving the Debtor that may be pending on the Effective Date;

- Enter any necessary or appropriate orders to implement or consummate the Plan's provisions and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

- Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, or any Person's obligations incurred in connection with the Plan;

- Hear and determine any motion or application to modify the Plan before or after the Effective Date under Bankruptcy Code § 1127 or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan or the Disclosure Statement; or hear or determine any motion or application to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document issued, entered into, filed or delivered in connection with the Plan or the Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

- Issue injunctions, enter and implement other orders, or take any other necessary or appropriate actions to restrain any entity's interference with consummation or enforcement of the Plan;

- Enter and implement any necessary or appropriate orders if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;



Case 2:14-bk-04372-GBN Doc 341 Filed 11/01/16 Entered 11/01/16 17:50:51 Desc Main Document Page 31 of 42

- Determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;
- Issue a final decree and enter an order closing the Chapter 11 Case;
- Adjudicate any matter concerning the Unsecured Creditor Trust; and
- Adjudicate the Disputed Claims, the Avoidance Actions, and the Litigation Claims and any other cause of action or claims of the Estate.

## 8. ACCEPTANCE AND CONFIRMATION OF THE PLAN

### 8(a) Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired Claims that are receiving distributions under the Plan vote to accept the Plan, except under certain circumstances. Bankruptcy Code §1126(c) defines acceptance of a plan by a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Under Bankruptcy Code §1126(d), a Class of Equity Interests has accepted the Plan if holders of such Equity Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Bankruptcy Code §1126(f) deems a Class of Claims or Equity Interests to have accepted the Plan without voting if that Class is unimpaired under the definition in Bankruptcy Code §1124. Classes 1 and 2 under the Plan are unimpaired and, therefore, are deemed to accept the Plan. Classes 3 and 4 are impaired under the Plan and will be solicited to vote on the Plan. Class 5 receives no distribution under the Plan and is deemed to reject the Plan without voting and, therefore, will not be solicited to vote on the Plan.

### 8(b) Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor. This requirement is imposed by Bankruptcy Code §1129(a)(11) and is popularly referred to as the "feasibility" requirement. The Plan Proponents believe that the Debtor, the Purchaser, and Reorganized Accipiter will be able to perform timely all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Plan Proponents refers to the Effective Date Balance Sheet and the Operating Projections included in **Appendix 3**. **Appendix 3.1** contains the Debtor's operating projections through December 16, 2016, which were filed by the Debtor as an exhibit to that certain 13th Stipulated Order Authorizing Use of Cash Collateral and Granting Adequate Protection [D.I. 306]. **Appendix 3.2** contains Effective Date Balance Sheet and the Operating Projections post-Effective Date.[3] Purchaser has a commitment letter

[3] The Operating Projections post-Effective Date included in Appendix 3.2 are for a period of one year and incorporate the legacy rate of return model. Since the Debtor has made the election to move to model-based USF support, the portion of the Debtor's projected revenues that are from legacy rate of return USF support would be replaced by model-based USF support. As of November 1, 2016, it is not possible to know what amount of model-based USF support that the Debtor or Reorganized Accipiter would receive if the Debtor were to make the election because the FCC will not provide the Debtor with information on its share of the model-based USF support funds

from McCook National Bank for a $4 million loan to finance the Stock Purchase Proposal. Such commitment letter does not contain any conditions regarding the Debtor's November 1 decision to elect model-based USF support. In addition, Purchaser has sufficient funds available to fund the balance of the Purchase Price on the Effective Date. Moreover, it is a condition to the Effective Date that the Debtor has a minimum of $1.5 million in Cash. Accordingly, the Plan Proponents believe that Reorganized Accipiter will have sufficient Cash on hand as of the Effective Date to make, on the Effective Date or as soon as practicable thereafter, all payments on account of all Allowed Claims required under the Plan when due.

Accordingly, the Plan Proponents believe that the Plan satisfies the feasibility requirement of Bankruptcy Code §1129(a)(11). The Plan Proponents caution that no representations can be made as to the accuracy of the Effective Date Balance Sheet or the Operating Projections or as to Reorganized Accipiter's ability to achieve the projected results. Certain of the assumptions on which the Effective Date Balance Sheet and the Operating Projections are based are subject to uncertainties outside the Debtor's or Reorganized Accipiter's control. Some assumptions inevitably will not materialize. Events and circumstances occurring after the date on which the Effective Date Balance Sheet and Operating Projections were prepared may be different from those assumed or may be unanticipated and may adversely affect the Debtor's or Reorganized Accipiter's financial results. Therefore, actual results can be expected to vary from projected results. Those variations may prove material and adverse. *See* "Risk Factors" below.

Neither the Effective Date Balance Sheet nor the Operating Projections was prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the Securities and Exchange Commission regarding projections. Neither the Effective Date Balance Sheet nor the Operating Projections has been audited by independent accountants. Although presented with numerical specificity, the Effective Date Balance Sheet and the Operating Projections are based on a variety of assumptions, some of which in the past have not been achieved and which may not be realized in the future, and remain subject to significant business, economic, regulatory, and competitive uncertainties and contingencies, and many of which are beyond any party's control. Consequently, neither the Effective Date Balance Sheet nor the Operating Projections should be regarded as a representation or warranty by any Person that projections will be realized. Actual results may vary materially and adversely from those presented.

**8(c) Best Interests Test**

8(c)(1) Explanation

Even if a plan is accepted by each class of claim holders, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Bankruptcy Code §1129(a)(7), requires a bankruptcy court to find either that: (i) all members of an impaired class of claims or interests have accepted the plan; or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of

---

for some number of months after the November 1, 2016 deadline as it must first determine which carriers made the election and then allocate the available funds among the electing carriers. However, Purchaser does not believe that any difference in the amount of USF support provided during the period of the Operating Projections would be material.

a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by: (1) the claims of any secured creditors to the extent of the value of their collateral; and (2) the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the Chapter 7 trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor or the Chapter 11 Trustee in the bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the Debtor during the pendency of the bankruptcy case.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors from the remaining available proceeds in liquidation. If the probable distribution has a value greater than the distributions to be received by such creditors under the plan, then the plan is not in the best interests of creditors and equity security holders.

8(c)(2) Application of the Liquidation Analysis

A liquidation analysis prepared with respect to the Debtor is attached as **Appendix 4** to this Disclosure Statement. Any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. The Debtor has projected the amount of Allowed Claims based on a review of the Schedules, the Debtor's books and records, and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Allowed Interests under the Plan.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Purchaser and the Committee believe that, taking into account the liquidation analysis, the Plan meets the "best interests" test of Bankruptcy Code §1129(a)(7). The Plan Proponents believe that each member of each Class will receive at least as much under the Plan as it would in a hypothetical Chapter 7 liquidation. Creditors will receive a better recovery through the distributions contemplated by the Plan because ceasing the Debtor's operations and liquidating the Debtor's limited tangible assets will yield proceeds far from sufficient to satisfy RUS's lien, to the extent secured and properly perfected, eliminating any possibility for recovery for any other Claims and any holder of Claims other than RUS.

## 9. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 9(a) Introduction

The following is a summary of certain U.S. federal income tax consequences of the Plan to Reorganized Accipiter and U.S. Holders (as defined below) of Claims or Equity Interests. This summary is based on the Internal Revenue Code of 1986, as amended (the "*Code*"), Treasury regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and we do not intend to seek a ruling from the Internal Revenue Service (the "*IRS*") as to any of the tax consequences of the Plan discussed below. Events occurring after the date of this Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Restructuring Transaction. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to us or any Holder of a Claim or Equity Interest. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are not "U.S. persons" (as such phrase is defined in the Tax Code). This summary does not apply to Holders of Claims or Equity Interests that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, governmental authorities or agencies, banks, financial institutions, insurance companies, entities classified as partnerships for U.S. federal income tax purposes, tax-exempt organizations, brokers and dealers in securities, regulated investment companies, real estate investment trusts, small business investment companies, employees, persons who receive their Claims or Equity Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Equity Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following discussion assumes that Holders of Claims or Equity Interests hold such Claims or Equity Interests as "capital assets" within the meaning of Code section 1221. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to us and Holders of Claims or Equity Interests based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, estate, gift, non-U.S. or any other applicable tax law.

For purposes of this summary, a "U.S. Holder" means a Holder of a Claim or Equity Interest that is, for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if (a) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust, or (b) it has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If an entity classified as a partnership for U.S. federal income tax purposes holds a Claim or Equity Interest, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of

the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the Plan.

***The U.S. federal income tax consequences of the Plan are complex. The following summary is for informational purposes only and is not a substitute for careful tax planning and advice based on the individual circumstances pertaining to a Holder of a Claim or Equity Interest. All Holders of Claims and Equity Interests are urged to consult their own tax advisors as to the consequences of the restructuring described in the Plan under federal, state, local, non-U.S. and any other applicable tax laws.***

**9(b) Federal Income Tax Consequences to Reorganized Accipiter**

Taxpayers generally must include in gross income the amount of any cancellation of debt income, which is the difference between the amount of a taxpayer's indebtedness that is cancelled and the amount or value of the consideration exchanged therefore. Even if indebtedness of the Debtor is discharged or released under the Plan, Reorganized Accipiter should not recognize taxable cancellation of debt income if the discharge or release is pursuant to a chapter 11 bankruptcy proceeding. Although Reorganized Accipiter will not be required to recognize cancellation of indebtedness income, it must instead reduce certain tax attributes by the amount of unrecognized cancellation of indebtedness income after the determination of the tax for the year of discharge or release in the manner prescribed by section 108(b) of the Code. Tax attributes include net operating losses, capital losses and loss carryovers, certain tax credits and, subject to certain limitations, the tax basis of property.

**9(c) Federal Income Tax Consequences to Holders of Claims and Equity Interests**

9(c)(1) In General

The U.S. federal income tax consequences to U.S. Holders of Allowed Claims and Equity Interests arising pursuant to the Plan may vary, depending upon, among other things: (a) the manner in which a U.S. Holder acquired an Allowed Claim or Equity Interest; (b) the type of consideration received by the U.S. Holder of an Allowed Claim or Equity Interest in exchange for the interest it holds; (c) the nature of the indebtedness owed to it; (d) whether the U.S. Holder previously claimed a bad debt or worthless securities deduction in respect of the Allowed Claim or Equity Interest; (e) whether the U.S. Holder of the Allowed Claim or Equity Interest is a citizen or a resident of the U.S. for tax purposes; (f) whether the U.S. Holder of the Allowed Claim or Equity Interest reports income on the accrual or cash basis method of accounting; and (g) whether the U.S. Holder receives distributions in more than one (1) taxable year. In addition, where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Allowed Claim or Equity Interest constitutes a capital asset in the hands of the U.S. Holder and how long it has been held or is treated as having been held, and whether the Allowed Claim was acquired at a market discount. The following summary does not apply to any Holders of Claims that are a government or government agency, which are generally exempt from U.S. federal income tax.

In general, the receipt of Cash in exchange for an Allowed Claim should result in the recognition of gain or loss in an amount equal to the difference between (i) the amount of any Cash (other than any Cash attributable to accrued but unpaid interest) and (ii) the U.S. Holder's tax basis in its Allowed Claim (other than any Claim for accrued but unpaid interest). To the extent that a U.S. Holder of a General Unsecured Claim receives Cash equal to the entire

amount of its Claim and such U.S. Holder's basis in such Claim is equal to the amount of the Claim, a U.S. Holder will not recognize gain or loss. A U.S. Holder of an Equity Interest will generally recognize a loss equal to its basis in such Equity Interest when such Equity Interest is extinguished.

If the Claim or Equity Interest in the U.S. Holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the U.S. Holder held such Claim or Equity Interest for longer than one (1) year or short-term capital gain or loss if the U.S. Holder held such Claim or Interest for one (1) year or less. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitation.

A U.S. Holder of a Claim or Equity Interest who receives, in respect of its Claim, an amount that is less than its tax basis in such claim or equity interest may be entitled to a bad debt deduction under section 166(a) of the Code or a loss under section 165(a) of the Code. The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the U.S. Holder, the obligor, and the instrument with respect to which a deduction is claimed. Accordingly, U.S. Holders are urged to consult their tax advisors with respect to their ability to take such a deduction if either: (1) the U.S. Holder is a corporation; or (2) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the U.S. Holder or (b) a debt the loss from the worthlessness of which is incurred in the U.S. Holder's trade or business. A U.S. Holder that has previously recognized a loss or deduction in respect of its Claim or Equity Interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the U.S. Holder's adjusted basis in such Claim or Equity Interest.

Whether the U.S. Holder of a Claim or Equity Interest will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the U.S. Holder and its Claims or Interests. Accordingly, U.S. Holders of Claims and Interests should consult their own tax advisors.

9(c)(2) Accrued Interest

U.S. Holders of Claims who were not previously required to include any accrued but unpaid interest in their gross income on a Claim may be treated as receiving taxable interest income taxable at tax rates for ordinary income to the extent any consideration they receive under the Plan is allocable to such interest. U.S. Holders of Claims previously required to include in their gross income any accrued but unpaid interest on a claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan. Under the Plan, to the extent that any Allowed Claim entitled to a distribution is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the distribution exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

9(c)(3) Market Discount

If a U.S. Holder of an Allowed Claim purchased the Claim at a discount, the difference may constitute "market discount" for U.S. federal income tax purposes. Any gain recognized by a U.S. Holder of a debt obligation with market discount should be treated as ordinary interest

income to the extent of any market discount accrued on the Claim by the U.S. Holder on or prior to the date of the exchange.

### 9(d) Information Reporting and Backup Withholding

Reorganized Accipiter will withhold all amounts required by law to be withheld. Reorganized Accipiter will comply with all applicable reporting requirements of the Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8BEN or W-8BEN-E (or otherwise establishes such Non-U.S. holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

### 9(e) Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain United States federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Creditor's particular circumstances. Accordingly, Creditors are strongly urged to consult their tax advisors about the United States federal, state and local and applicable foreign income and other tax consequences of the Plan, including with respect to tax reporting and record keeping requirements.

## 10. RISK FACTORS

### 10(a) Generally

The Debtor's reorganization and restructuring involves risk. This Disclosure Statement and certain of its Appendices contain forward-looking statements that involve risks and uncertainty. Reorganized Accipiter's actual results could differ materially from those anticipated in these forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement. **Holders of Claims or Equity Interests should consider carefully the following factors in addition to the other information contained in this Disclosure Statement**.

*Regulatory Environment*. Reorganized Accipiter operates in a highly-regulated industry. Various federal and state agencies, some of which are run by political appointees, can materially

affect Reorganized Accipiter's operating environment as well as several sources of Reorganized Accipiter's revenue. For example, federal support from USF constituted approximately 70% of the Debtor's gross annual revenue as of the Petition Date. This federal revenue support is the result of the Debtor's participation in federal subsidy programs that are subject to periodic and often unpredictable regulatory changes and rulemaking by the FCC and other governmental agencies. Because Reorganized Accipiter will be relying heavily on federal subsidy revenues post-Effective Date and because those revenues will always be subject to adjustment by ongoing FCC rulemaking, it is possible that governmental regulatory action could materially and adversely affect Reorganized Accipiter's revenue and cash flows. Historically—and even within the last few months—FCC rule changes have, without exception, resulted in significant reductions in the Debtor's USF support and, therefore, a significant and abrupt reduction in the Debtor's overall gross revenue. The Debtor believes that further reductions in USF support resulting from future FCC rule changes or the Debtor's election of its USF support mechanism are possible but that there is no way to predict when those changes will come and how they will affect Reorganized Accipiter's revenues. The Debtor elected to receive USF support on November 1 using the model based support mechanism, but it is not possible to predict with certainty the impact such an election will have on the Debtor or Reorganized Accipiter. The impact of such election on the amount of USF support provided annually to the Debtor or Reorganized Accipiter over the next ten years will depend on a number of future factors, including the number and type of rate of return companies that elect to receive USF using the model-based support mechanism. Under the model-based USF support mechanism, the Debtor believes that its broadband deployment obligations are likely to be less costly and more gradual than the build out requirements under the legacy rate of return model and believes that the amount of annual USF support will be certain but likely lower than under the legacy rate of return model. The Purchaser believes that there will be sufficient USF support to cover the capital required to meet the build out requirements in the future years under either the model-based USF support or legacy rate of return model. Neither the Debtor nor the Plan Proponents can predict whether and the extent to which any of the requirements for USF support for rate of return carriers described herein will be modified, and, if modified, the impact that such changes will have on the Debtor or Reorganized Accipiter. The Purchaser is prepared to consummate the proposed Share Purchase Proposal and the Plan understanding that the Debtor made the election to receive USF using the model-based support mechanism.

The Projections contained in **Appendix 3** are based on the legacy rate of return model. *See* discussions in section 8(b) "*Feasibility of the Plan*".

As noted above, the Debtor obtained a waiver of one FCC rule change shortly before the Petition Date, but that waiver came with a strong indication from the FCC that the Debtor should expect further significant reductions in USF support over time and should endeavor to reduce its dependence on federal subsidies. If the Debtor is unable to achieve increased customer revenue to offset present and future reductions in USF revenue, the Reorganized Accipiter may be unable to sustain operations.

As noted above, depending on the outcome of any Debtor challenge to the FCC's broadband penetration determination and the USF support mechanism selected by the Debtor, it is possible that Reorganized Accipiter's level of USF support will be below predicted levels and it also is possible that Reorganized Accipiter will have to deploy substantial additional capital to meet the applicable FCC broadband build out requirement.

*Competitive Environment.* The Debtor operates in a large geographic service area in Maricopa and Yavapai Counties in Arizona. The Debtor is the only terrestrial

telecommunications provider serving a significant portion of that service area. In other areas, the Debtor competes for customers with other providers such as Cox Communications and wireless providers. These are known as areas of "competitive overlap." As Reorganized Accipiter's competitive overlap increases as a percentage of its service area, its USF revenue will most likely decrease, forcing Reorganized Accipiter to compete with far larger and more highly capitalized companies for customer accounts and the revenue associated with those accounts. Although the Debtor has recently been recognized as the fastest internet service provider in Arizona and currently employs gigabit fiber-to-the-home network technology in Maricopa County, Reorganized Accipiter's competitors may succeed in reducing or eliminating Reorganized Accipiter's competitive advantages associated with this speed and infrastructure and better compete for customers in areas of competitive overlap. Unless Reorganized Accipiter is able to maintain and grow its market share within its service area, its cash flow may prove insufficient to permit Reorganized Accipiter to meet its restructured debt obligations.

*Certain Regulatory Approvals are Required for Emergence from Bankruptcy.* In order to emerge from bankruptcy pursuant to the terms of the Plan, the Debtor and/or Reorganized Accipiter must receive certain FCC Approvals and State PUC Approvals. It is possible that the FCC Approvals and/or the State PUC Approvals will not be obtained. If any of the necessary FCC Approvals and/or State PUC Approvals are not obtained, the Effective Date will not occur under the Plan. Furthermore, it is unclear how long it will take to obtain the FCC Approvals and/or State PUC Approvals. As a result, there could be a significant delay between the entry of the Confirmation Order and the Effective Date.

*Effective Date Cash.* The Plan Proponents believe that Reorganized Accipiter will have sufficient cash on hand on the assumed Effective Date of March 31, 2017 to meet all its Effective Date payment obligations under the Plan. There is a small risk, however, that unforeseen circumstances and unanticipated operating expenses could deplete the Debtor's cash in a way that makes Reorganized Accipiter unable to meet all Effective Date payments obligations by what the Plan Proponents expects to be its Effective Date. Furthermore, as a condition to the occurrence of the Effective Date, the Debtor must have a Net Working Capital of at least $250,000 and a minimum Cash on hand balance of not less than $1.5 million (exclusive of the Purchase Price payment). Although the Plan Proponents could delay the Effective Date until sufficient cash exists, it is possible, however unlikely, that the Debtor may fail to accumulate sufficient cash to bring about the Effective Date.

**10(b) Risk of Non-Confirmation of the Plan**

Although the Plan Proponents believe that the Plan satisfies all legal and factual requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will agree. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that modifications would not adversely affect holders of Allowed Claims and Equity Interests, or that modifications would not necessitate re-solicitation of votes.

## 11. ALTERNATIVES TO THE PLAN

The Plan Proponents believe that the Plan affords holders of Claims and Equity Interests the greatest possible recovery under the circumstances and, therefore, is in their best interests. But if the Plan is not confirmed, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Case without any immediately-available financing; (b) an alternative plan; (c) a sale of substantially all the Debtor's assets; or (c) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

### 11(a) Continuation of the Chapter 11 Case

The Plan is designed to maximize distributions to Creditors while allowing the Debtor to continue its business operations into the future. That business objective is unlikely to change in any material way, so continuing the Chapter 11 Case would serve only to increase the Administrative Expense Claims (especially those associated with legal fees) and delay and reducing recoveries to holders of Claims. Remaining under Chapter 11 protection may also continue to reduce the Debtor's ability to compete in its market and maintain healthy relationships with critical vendors and suppliers.

### 11(b) Alternative Plans of Reorganization

Until the Plan is confirmed, the Debtor or any other party-in-interest could propose a different plan or plans. Those plans might involve either a reorganization and continuation of the Debtor's business or the orderly liquidation of the Debtor's assets. The Plan Proponents have proposed what they believe to be the optimal reorganization plan that maximizes recoveries to all Creditors without jeopardizing Reorganized Accipiter's ability to meet the very obligations it proposes in the Plan to assume. For this reason, the Plan Proponents do not believe that any alternative plan would serve Creditors' needs as well as the currently-proposed Plan.

### 11(c) Liquidation Under Chapter 7

If no plan is confirmed, the Debtor's Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee would be appointed to liquidate the Debtor's assets. Although it is theoretically possible for a Chapter 7 trustee to maintain the Debtor's operations and sell assets as a going concern (that is, at a higher value than if the Debtor's operations were shut down), the Plan Proponents believe that no Chapter 7 trustee would endeavor to maintain operations. The Estate would lose all its goodwill and all its customer accounts, and hundreds of rural customers would be left without telecommunications service at all. Worse, the vast bulk of the Debtor's tangible assets is buried cable—of highly questionable value where the network it comprises is no longer functioning. Thus, the Plan Proponents believe that holders of Claims would lose most of the intrinsic value of the Debtor's currently operational assets with the effect that RUS would receive mere cents on the dollar for its senior secured Claims and the rest of the Estate's Creditors would receive nothing.

## 12. CONCLUSION

### 12(a) Hearing on and Objections to Confirmation

12(a)(1) Confirmation Hearing

The hearing on confirmation of the Plan has been scheduled for December 14, 2016 at 1:30 p.m. (Arizona time). The hearing may be adjourned from time to time by announcing the adjournment in open court, all without further notice to parties-in-interest, and the Plan may be modified under Bankruptcy Code §1127 before, during, or as a result of that hearing, without further notice to parties in interest.

12(a)(2) Deadline for Objections to Confirmation

The time by which any objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for December 7, 2016 at 5:00 p.m. (Arizona time).

**12(b) Recommendation**

The Plan provides for the best possible and most equitable distribution to Creditors. The Plan Proponents believe that any alternative to confirmation of the Plan, such as Chapter 7 liquidation or attempts by another party-in-interest to file a plan, would result in significant delays, litigation, and additional costs with no benefit. For these reasons, the Plan Proponents urge you to vote to accept the Plan and to support Confirmation of the Plan.

Dated: November 1, 2016

Respectfully submitted,

*/s/ Jared G. Parker*
Jared G. Parker
PARKER SCHWARTZ, PLLC
7310 North 16th Street, Suite 330
Phoenix, AZ 85020

Lisa G. Beckerman
Joanna Newdeck
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036

*Counsel for Pinpoint Holdings, Inc.*

*/s/ Christopher C. Simpson*
Alisa C. Lacey
Christopher C. Simpson
STINSON LEONARD STREET LLP
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85004

*Counsel for the Official Committee of Unsecured Creditors*